

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| | | |
|---|---|---|
| VERIZON WIRELESS (VAW) LLC, COMMNET CELLULAR LICENSE HOLDING LLC, MISSOURI VALLEY CELLULAR, INC., SANBORN CELLULAR, INC., and EASTERN SOUTH DAKOTA CELLULAR, INC., d/b/a VERIZON WIRELESS, | * * * * * * * * * | CIV 04-3014 **2006 D.S.D. 15** |
| Plaintiffs, | * * | |
| -vs- | * * * | OPINION AND ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| BOB SAHR, GARY HANSON and DUSTIN JOHNSON, in their official capacities as the Commissioners of the South Dakota Public Utilities Commission, | * * * * * | |
| Defendants, | * * | |
| SOUTH DAKOTA TELECOM- MUNICATIONS ASS'N and VENTURE COMMUNICATIONS COOPERATIVE, | * * * * * | |
| Intervenors. | * * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**KORNMANN, U.S. DISTRICT JUDGE**

## INTRODUCTION

[¶1]    Plaintiffs have filed a motion (Doc. 51) for summary judgment, contending certain provisions of the South Dakota Codified Laws are preempted by federal law.  During the 2004 legislative session, the South Dakota Legislature enacted several new provisions, which impose certain requirements on telecommunications carriers and tie those requirements to carrier

compensation.  Plaintiffs assert the state's new regulatory scheme impermissibly conflicts with the established federal regulatory framework and, therefore, it is preempted.

[¶2]    Plaintiffs Verizon Wireless (VAW) LLC, CommNet Cellular License Holding LLC, Missouri Valley Cellular, Inc., Sanborn Cellular, Inc., and Eastern South Dakota Cellular (collectively "Verizon") all provide wireless telecommunications in South Dakota under the "Verizon Wireless" brand name.  In the telecommunications industry, wireless carriers are referred to as Commercial Mobile Radio Service or "CMRS" providers.  CMRS providers essentially offer one-way or two-way radio communication services between land stations and mobile receivers.  *See* 47 C.F.R. § 20.3.

[¶3]    Verizon, in conjunction with its provision of CMRS services in South Dakota, sends and receives calls to and from state regulated landline companies.  These companies are referred to as local exchange carriers ("LECs").  LECs may also be referred to as incumbent local exchange carriers ("ILECs") or competitive local exchange carriers ("CLECs").  An ILEC is a telephone company that was providing local service when the Telecommunications Act of 1996 was enacted.  Whereas, CLEC is the term used for any company that offers local telephone service and was not the original monopoly telephone company in a specific area.

[¶4]    Defendants Bob Sahr, Gary Hanson, and Dustin Johnson are Commissioners of the South Dakota Public Utilities Commission ("SDPUC").  SDPUC is given legislative and statutory authority under Title 49 of the South Dakota Codified Laws and is responsible, among other things, for regulating intrastate telecommunications rates and service quality.  Pursuant to a motion (Doc. 18) to intervene, which was unopposed, South Dakota Telecommunications Association ("SDTA") and Venture Communications Cooperative became parties to this suit.

[¶5]    SDTA is comprised of 29 community-based cooperative, privately owned, municipal and tribal telecommunications companies.  Collectively, these companies serve approximately 80 percent of the state's land mass and roughly two-thirds of the state's incorporated communities. SDTA provides regulatory and legal assistance to its member companies and representation before the Federal Communications Commission ("FCC"), the SDPUC, and various other governmental agencies.  Venture Communications Cooperative, a non-profit organization and a

2

member company of SDTA, provides communication services to cooperative members located throughout central and northeastern South Dakota.

## DISCUSSION

### 1. SUMMARY JUDGMENT STANDARD

[¶6]    The summary judgment standard is well known and has been set forth by this court in numerous opinions. *See* Hanson v. North Star Mutual Insurance Co., 1999 DSD 34 ¶ 8, 71 F.Supp.2d 1007, 1009-1010 (D.S.D. 1999), Gardner v. Trip County, 1998 DSD 38 ¶ 8, 66 F.Supp.2d 1094, 1098 (D.S.D. 1998), Patterson Farm, Inc. v. City of Britton, 1998 DSD 34 ¶ 7, 22 F.Supp.2d 1085, 1088-89 (D.S.D. 1998), and Smith v. Horton Industries, 1998 DSD 26 ¶ 2, 17 F.Supp.2d 1094, 1095 (D.S.D. 1998). Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Donaho v. FMC Corporation, 74 F.3d 894, 898 (8th Cir. 1996). The United States Supreme Court has held that:

> The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "A material fact dispute is genuine if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party." Landon v. Northwest Airlines, Inc., 72 F.3d 620, 634 (8th Cir. 1995). "[T]he burden on the moving party may be discharged by 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex Corporation v. Catrett, 477 U.S. at 325, 106 S.Ct. at 2554. Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324, 106 S.Ct. at 2553. In considering the motion for summary judgment, this Court must view the facts in the light most favorable to the

3

non-moving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. <u>Donaho</u>, 74 F.3d at 897-98. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

## 2. THE LAW OF PREEMPTION

[¶7]    The Supremacy Clause of Art. VI of the United States Constitution invests Congress with the authority to preempt state law. U.S. Const. Art. VI, Cl. 2; <u>Louisiana Public Service Com'n v. FCC</u>, 476 U.S. 355, 368 (1986). Federal preemption occurs when: (1) Congress explicitly prohibits state regulation; (2) Congress implicitly prohibits state regulation by pervasively occupying the regulatory field and leaving no room for the states to supplement federal law; (3) state law directly conflicts with federal law; or (4) a federal agency, acting within the scope of its delegated authority, intends its regulations to have preemptive effect. <u>Id.</u>

[¶8]    Preemption by the FCC of state regulation of telephone services is permissible when: (a) the matter to be regulated has both interstate and intrastate aspects; (b) preemption is necessary to protect a valid federal regulatory objective; and (c) state regulation would negate the exercise by the FCC of its own lawful authority because regulation of the interstate aspects of the matter cannot be "unbundled" from regulation of the intrastate aspects. <u>Public Service Com'n of Maryland v. FCC</u>, 909 F.2d 1510 (D.C. Cir. 1990); <u>Qwest Corporation v. Scott</u>, 380 F.3d 367, 372 (8th Cir. 2004). The FCC is barred from preempting state regulation of a subject matter where there is a way to separate the interstate component from the intrastate component. <u>Louisiana Public Service Com'n</u>, 476 U.S. at 375 fn. 4, 106 S.Ct. at 1902 fn. 4; <u>Qwest Corporation</u>, 380 F.3d at 372.

[¶9]    Moreover, the FCC may preempt any state or local statute or regulation that prohibits or has the effect of prohibiting the ability of any entity to provide telecommunications service. 47 U.S.C. § 253(a); <u>XO Missouri v. City of Maryland Heights</u>, 256 F.Supp.2d 987, 991 (E.D.Mo. 2003). Section 253(a) contains the only substantive limitations on state government regulation of telecommunications and the following two subsections are "safe harbors," functioning as affirmative defenses to preemption of state exercise of authority that would otherwise violate the

4

first subsection. Thus, if a state statute does not meet the criteria of the second and third subsections, the state government has not "violated" the subsections, but the particular regulation is not immune from preemption as an exception to the general prohibition in the first subsection. Level 3 Communications, LLC v. City of St. Louis, Mo., 405 F.Supp.2d 1047, 1056 (E.D.Mo. 2005). Therefore, prior to declaring a statute preempted, we must conduct both an analysis of whether the statute violates the first subsection, containing the substantive limitations on state government regulation of telecommunications, and an analysis under the safe harbor provisions. Id.

### 3. THE TELECOMMUNICATIONS ACT OF 1996 AND FCC IMPLEMENTING DECISIONS

[¶10]   Congress enacted the Telecommunications Act ("the Act" or "the 1996 Act") in February of 1996, greatly amending the Communications Act of 1934. The Act "is a unique hybrid of statutory and common law that divides decision making authority among the FCC, State commissions, and private parties." Southwestern Bell Tel. Co. v. Connect Communications Corporation, 72 F.Supp.2d 1043, 1044 (E.D.Ark. 1999), rev'd on other grounds, 225 F.3d 942 (8th Cir.2000). The purpose of the Act is the promotion of competition and the reduction of regulation in the telecommunications industry, in order to secure lower prices and higher quality services for American telecommunications consumers and to encourage the rapid deployment of new telecommunications technology. Telecommunications Act of 1996, Pub. L. No. 104-104, purpose statement; 110 Stat. 56 (1996).

[¶11]   The 1996 Act limits the power of the states. Because certain aspects of telecommunications regulation are uniquely the province of the federal government and Congress has narrowly circumscribed the role of state and local governments in this arena, municipalities have a very limited and proscribed role in the regulation of telecommunications. City of Auburn v. Qwest Corporation, 260 F.3d 1160, 1170 (9th Cir. 2001). Specifically, by statute, as already noted, no state or local statute or regulation, or other state or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service. 47 U.S.C. § 253(a). The FCC may preempt, after notice and opportunity to comment, any state or local statute or regulation that violates this provision. 47 U.S.C. § 253(d).

5

[¶12]   States and local governments do retain, however, the authority to impose requirements that are not discriminatory and competitively neutral to preserve universal service, protect public safety and welfare, ensure quality service, and safeguard consumer rights.  47 U.S.C. § 253(b). Whether the recent changes in South Dakota meet these requirements is at issue in this action. Finally, the States have also been given jurisdiction over intrastate services pursuant to 47 U.S.C. § 152(b).  This section provides, in part, as follows:

> Except as provided in sections 223 through 227 of this title, inclusive, and section 332 of this title, and subject to the provisions of section 301 of this title and subject to chapter V-A of this chapter, nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classification, practices, services, facilities, or regulations for or in connection with intrastate communications by wire or radio of any carrier . . .

In addition, 47 U.S.C. § 261(c) provides:

> Nothing in this part precludes a State from imposing requirements on a telecommunications carrier for intrastate services that are necessary to further competition in the provision of telephone exchange service or exchange access, as long as the State's requirements are not inconsistent with this part or the Commission's regulations to implement this part.

[¶13]   While the power of the States has been further limited by the Act, they still share some jurisdiction over telecommunications with the federal government.

[¶14]   The federal legislation fundamentally restructures local telephone markets, ending the monopolies that states historically granted to local exchange carriers and subjecting incumbent local exchange carriers to a host of duties intended to facilitate market entry, including the obligation to share their networks with competitors.  AT & T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 119 S. Ct. 721, 142 L. Ed. 2d 835 (1999).  To break down barriers to competition in the local telephone market, the Act requires all carriers to "interconnect, directly or indirectly" with other carriers.  47 U.S.C. § 251(a)(1).  Carriers are said to be directly interconnected when they establish physical links between their networks for traffic exchange.  Carriers are indirectly interconnected when they use a third party tandem transit service to interconnect the two networks.

[¶15]   The Telecommunications Act also establishes procedures for negotiation, arbitration, and approval of interconnection agreements, whether arrived at through voluntary negotiation or

compulsory arbitration; this includes pricing standards. *See* 47 U.S.C. §§ 252 and 251(b)(5). Section 251(b)(5) imposes on all LECs a "duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications." 47 U.S.C. § 251(b)(5). In addition, 47 U.S.C. § 252(d)(2) imposes additional requirements on reciprocal compensation agreements involving an ILEC. State public utility commissions either approve interconnection agreements when the parties have reached a voluntary agreement or provide arbitration for the parties to resolve their differences. *See* 47 U.S.C. § 252(e)(1). Questions of interpretation and enforcement of an interconnection agreement between local exchange carriers are governed by the agreement itself and state law principles. Southwestern Bell Telephone Co. v. Brooks Fiber Communications of Oklahoma, Inc., 235 F.3d 493, 499 (10th Cir. 2000); Southwestern Bell Telephone Co. v. Connect Communications Corporation, 225 F.3d 942, 948 (8th Cir. 2000).

[¶16]   The FCC, prior to the 1996 Act, established rules governing LEC interconnection with CMRS providers. *See generally* Implementation of Sections 3(n) and 332 of the Communications Act and Regulatory Treatment of Mobile Services, GN Docket No. 93-252, Second Report and Order, 9 F.C.C. R. 1411 (1994) ("CMRS Second Report and Order") (subsequent history omitted); Rural Iowa Independent Telephone Association v. Iowa Utilities Board, 385 F.Supp.2d 797, 803 fn. 19 (S.D.Iowa 2005).

[¶17]   In 1994, the FCC adopted an order implementing section 332, holding that section 332 did not "limit or expand the [FCC's] authority to order interconnection pursuant to the [1934] Act." CRMS Second Report and Order, ¶ 220. 47 U.S.C. § 332(c)(1)(B) expressly grants the FCC the authority to order carriers to interconnect with CMRS providers. This section provides, in relevant part:

> Upon reasonable request of any person providing commercial mobile service, the Commission shall order a common carrier to establish physical connections with such service pursuant to the provisions of section 201 of the Act. Except to the extent that the Commission is required to respond to such a request, this subparagraph shall not be construed as a limitation or expansion of the Commission's authority to order interconnection pursuant to this Act.

CRMS Second Report and Order, ¶ 220.

[¶18]   47 U.S.C. § 201(a), in turn, provides that "[i]t shall be the duty of every common carrier engaged in interstate or foreign commerce by wire or radio . . . to establish physical connections

7

with other carriers . . ." Pursuant to its authority under section 201(a) of the Act, the FCC adopted rules requiring mutual compensation for the exchange of traffic between LEC and CMRS providers. *See* 47 C.F.R. § 20.11. In particular, the rules required the originating carrier, whether LEC or CMRS provider, to pay reasonable compensation to the terminating carrier in connection with traffic that terminates on the latter's network facilities. CMRS Second Report and Order, at 1498 ¶ 232 (adopting 47 C.F.R. § 20.11). Again, the FCC refused "to preempt state regulation of LEC intrastate interconnection rates." CMRS Second Report and Order, ¶ 231.

[¶19]   In the FCC's Local Competition Order, the FCC found newly enacted sections 251 and 252 applicable to the regulation of LEC-CMRS interconnection, concluding that these sections provide an "alternative basis for jurisdiction" to sections 201 and 332. Local Competition Order, CC Docket No. 96-98, First Report and Order, 11 F.C.C.R. 15499, 16005 ¶ 1022-1023 (1996); *see also* Iowa Utils. Bd. v. FCC, 120 F.3d at 800 (finding that the FCC has jurisdiction under section 332 to issue rules regarding LEC-CMRS interconnection, including reciprocal compensation rules). The FCC observed that "all four sections are designed to achieve the common goal of establishing interconnection and ensuring interconnection on terms and conditions that are just, reasonable, and fair." Local Competition Order, at 16005 ¶ 1023. The FCC believed this approach would facilitate consistent resolution of interconnection issues for CMRS providers and other carriers. Local Competition Order, at 16005 ¶ 1024. The FCC specifically reserved the right, however, to revisit invoking its jurisdiction under section 332 to regulate LEC-CMRS interconnection, if circumstances should so warrant. Local Competition Order, at 16006 ¶ 1025.

**4. INTERCARRIER COMPENSATION**

[¶20]   Interconnection arrangements between or among carriers are currently governed by a complex system of intercarrier compensation regulations, which distinguish among different types of carriers and different types of services based on regulatory classifications. In the Matter of Developing a Unified Intercarrier Compensation Regime, CC Docket No. 01-92, Intercarrier Compensation Notice of Proposed Rulemaking, 16 F.C.C.R. 9610, 9613 (2001). These regulations treat different types of carriers and different types of services disparately, even

8

though there may be no significant differences in the costs between or among carriers or services. In short, intercarrier compensation addresses the question of who should pay the costs of originating, transporting, and terminating calls or traffic that begin on one network and end on another network, often crossing or transiting a third network.

[¶21]   There are currently two general intercarrier compensation regimes: (1) access charges for long-distance traffic; and (2) reciprocal compensation.  Federal and state access charge rules govern the payments that interexchange carriers ("IXCs") and CMRS providers make to LECs that originate and terminate long-distance calls.  Federal or interstate access charge rules are set by the FCC.  Intrastate access charges and intrastate calling generally are governed by state public utility commissions.  CMRS carriers also pay access charges to LECs for CMRS to LEC traffic that is not considered local and hence not covered by the reciprocal compensation rules.

[¶22]   The role of the states in regulating CMRS providers is limited.  47 U.S.C. § 332(c)(3). That section bars the states from regulating the entry or rates of CMRS providers but expressly permits states to regulate other terms and conditions of service.  Section 332(c)(3) provides, in relevant part:

> Notwithstanding sections 2(b) and 221(b), no state or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a state from regulating the other terms and conditions of commercial mobile services.

Id.   However, 47 U.S.C. § 251(d)(3) preserves state access regulations that are consistent with § 251.  The section provides:

> In prescribing and enforcing regulations to implement the requirements of this section, the Commission shall not preclude the enforcement of any regulation, or order, or policy of a state commission that – (A) establishes access and interconnection obligations of local exchange carriers; (B) is consistent with the requirements of this section; and (C) does not substantially prevent implementation of the requirements of this section and the purposes of this part.

[¶23]   Reciprocal compensation rules, established under section 251(b)(5) of the Act, govern the compensation between telecommunications carriers for the transport and termination of local traffic.  *See* 47 C.F.R. § 51.701.  Reciprocal compensation refers to a situation where a CRMS customer calls a LEC customer who is within the same local calling area, whereupon the first

9

carrier pays the second carrier for completing, or 'terminating,' the call.  Pacific Bell v. Pac West Telecomm, Inc., 325 F.3d 1114, 1119 (9th Cir. 2003).

[¶24]   In its Local Competition Order, the FCC had to determine which telecommunications are subject to "reciprocal compensation" for "transport and termination" under section 251(b)(5).  In so doing, the FCC distinguished between transport and termination of "local" calls, and that for "long-distance" calls, the latter having been historically subject to access charges.  Local Competition Order, at 302-305, 11 F.C.C.R. ¶¶ 1035-1046.  For purposes of regulation, a call is treated as "local" if it originates and terminates in the same local calling area; a call is treated as "long distance" if it terminates in a local calling area different than the one in which it originates.  See Competitive Telecomms. Ass'n v. FCC, 117 F.3d 1068, 1072 fn. 3 (8th Cir.1997) (" CompTel ").

[¶25]   In defining the local service area for calls to or from a CMRS network for purposes of applying sections 251 and 252, the FCC determined that the Major Trading Areas ("MTAs") serve as the most appropriate definition for local service area for CMRS traffic rather than local exchange areas.  Local Competition Order, at 302, 11 F.C.C.R. ¶ 1036.  This ruling was subsequently formally adopted in FCC regulations at 47 C.F.R. § 51.701.  "The determination of whether a call is interMTA or intraMTA is made when the call is first connected, although a wireless user may travel into another MTA during the duration of the call."  Iowa Network Services, Inc. v. Qwest II, 363 F.3d 683, 687 fn. 2 (8th Cir. 2004).  To summarize, the FCC's Local Competition Order provides that "traffic to and from a CMRS network that originates and terminates with the same MTA" is "local" traffic and not long distance traffic subject to access charges.  This, of course, is important to keep in mind.

[¶26]   Under the amended rules, however, in the absence of a request for an interconnection agreement, no compensation is owed for termination.  In the Matter of Developing a Unified Intercarrier Compensation Regime, CC Docket 01-92, 20 F.C.C.R. 4855, 4863 ¶ 14, fn. 57, Declaratory Ruling and Report and Order (2005)("T-Mobile Order").  The FCC took this action pursuant to their plenary authority under sections 201 and 332 of the Act, the latter of which states that "[u]pon reasonable request of any person providing commercial mobile service, the FCC shall order a common carrier to establish physical connections with such service . . ."  47

U.S.C. § 332(c)(1)(B).  *See* <u>Local Competition First Report and Order </u>at 16005, 11 F.C.C.R.
¶1023 (affirming that "section 332 in tandem with section 201 is a basis for jurisdiction over
LEC-CMRS interconnection").

[¶27]   In <u>Iowa Utils. Bd. v. FCC</u>, the United States Court of Appeals for the Eighth Circuit held
that the FCC has authority to issue rules of special concern to CMRS providers.  *See* <u>Iowa Utils.
Bd. v. FCC</u>, 120 F.3d 753, 800 fn.21 (8th Cir. 1997) (vacating the FCC's pricing rules for lack of
jurisdiction except for "the rules of special concern to CMRS providers" based in part upon the
authority granted to the FCC in 47 U.S.C. § 332(c)(1)(B)), vacated and remanded in part on other
grounds, <u>AT&T Corporation v. Iowa Utils. Bd.</u>, 525 U.S. 366 (1999).  *See also* <u>Qwest v. FCC</u>,
252 F.3d 462, 465-66 (D.C. Cir. 2001) (describing the Eighth Circuit's analysis of section
332(c)(1)(B) in <u>Iowa Utils. Bd. v. FCC</u> and concluding that an attempt to relitigate the issue was
barred by the doctrine of issue preclusion).

5.  THE FUTURE INTERCARRIER COMPENSATION FRAMEWORK

[¶28]   The telecommunications marketplace has changed dramatically since the FCC adopted
the existing intercarrier compensation regimes.  For instance, most wireless services were not
widely available in the 1980s, when the FCC adopted the access charge regime, and wireless
services were only beginning to gain a foothold in the market in 1996.  <u>In the Matter of
Developing a Unified Intercarrier Compensation Regime</u>, CC-Docket 01-92, Further Notice of
Proposed Rulemaking, 20 F.C.C.R. 4685 ¶ 18 (2005).  Today, there are at least 160 million
wireless subscribers and the numbers continue to grow.  <u>Id.</u>  Recognizing these changes, the FCC
has expressed the desire to move away from the current patchwork of intercarrier compensation
rules, which the FCC views as transitional, to a more permanent regime that consummates the
pro-competitive vision of the Telecommunications Act of 1996 and recognizes new technologies,
such as the Internet and Internet-based services, and commercial mobile radio services
("CMRS").  Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 ("1996 Act").
The FCC claims to be particularly interested in identifying a unified approach to intercarrier
compensation, one that would apply to interconnection arrangements between all types of carriers
interconnecting with the local telephone network, and to all types of traffic passing over the local
telephone network.  *See* <u>Intercarrier Notice of Proposed Rulemaking</u>, 16 F.C.C.R. 9610.  Given

that the current rules are transitional and are not reflective of the principles espoused in the 1996 Act and the changes in the marketplace, considerable gaps are left to be filled in by the courts, the FCC and state commissions. Undoubtedly, this is the reason why these parties are in District Court. Why the FCC has not acted to "fill in" the gaps is a mystery to the Court.

## 6. TELECOMMUNICATIONS IN SOUTH DAKOTA

[¶29]   Due to South Dakota's largely rural nature, telecommunications service in many parts of the state has been traditionally provided by small independently owned companies located in and serving small designated geographic areas. One characteristic of the rural LEC business model is that they collect a significant percentage of their revenue from interstate and intrastate access charges. *See* 20 F.C.C.R. 4685 ¶ 107. According to NTCA, rural LECs receive on average 10 percent of their revenue from interstate access charges and 16 percent from intrastate access charges. Thus, the financial success of the rural LEC is strongly influenced by its ability to recover all access revenue.

[¶30]   However, recovery of access revenue is complicated by the technical difficulties that carriers face in classifying traffic and by the rise of the phenomena of "phantom traffic." "Phantom traffic" is used to describe calls that lack sufficient signaling information to enable intermediate and terminating providers to properly bill the originating provider for intercarrier compensation. The traffic identification problem was one of the impetuses behind  SDTA and industry lobbying, as well as South Dakota's passage of the statutes in dispute.

[¶31]   Another characteristic of the South Dakota telecom market is its high interMTA factor. MTA-12 (Minneapolis) covers roughly the eastern and central two thirds of South Dakota but also includes all of North Dakota and almost all of Minnesota. MTA-22 (Denver) covers roughly the western one-third of South Dakota but also includes much of Colorado, most of Wyoming, western Nebraska, and even a small part of Kansas. MTA-32 (Des Moines) covers the southeast corner of South Dakota, most of Iowa, the northeast corner of Nebraska, western Illinois, and small portions of Wisconsin and Missouri. Finally, much of the southern part of the state borders the Omaha MTA, so that traffic spills over into this MTA as well. These MTAs are important because, as previously discussed, a call that originates within a particular MTA and terminates within the same MTA is a local call.

12

**7. EIGHTH CIRCUIT PRINCIPLES**

[¶32]   On August 23, 2006, the United States Court of Appeals for the Eighth Circuit decided

WWC License, L.L.C. v. Boyle, 459 F.3d 880, (8th Cir. 2006).  I shall make reference to certain

principles garnered from this case:

a.   There is no question that a wireless provider's MTA is the local area for the purpose of reciprocal compensation.

b.   Reciprocal compensation is payment from the carrier who originates a call to the carrier which receives or terminates a call.  This is intended to permit the carrier for the customer who receives a call to recoup from the caller's carrier those expenses incurred for terminating the call or sending it to its final destination. Reciprocal compensation must "provide for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the network facilities of the other carrier." Ace Tel. Ass'n v. Koppendrayer, 432 F.3d 876, 878 (8th Cir. 2005).

c.   It is purely a question of federal law as to the proper interpretation of the provisions of the Act.

d.   Federal statutory duties are not limited with reference to technical feasibility or expense.

e.   All else being equal, if a provision of the Act is vague, a court must interpret the provision in a manner that promotes competition.  Congress passed the Act with the intention of eliminating monopolies and fostering competition.

f.   Courts should be wary of interpretations that simultaneously expand costs for competitors (such as a requirement for direct connections) and limit burdens on incumbents (such as a limitation of dialing parity to local exchange boundaries). If a cost is imposed on a competitor, it becomes a barrier to entry and rewards the company who previously benefitted from monopoly protection.

g.   Courts should interpret a vague provision in a manner that reduces barriers to entry.

**8. THE DISPUTE BETWEEN THE PARTIES**

[¶33]   This dispute is not about the specific terms or amounts to be billed among the carriers for

traffic subject to either reciprocal or access compensation.  These terms and conditions have

already been negotiated or arbitrated between the various CMRS providers and the LECs.

Rather, this dispute is about the difficulty carriers face in classifying traffic due to the rise of

phantom traffic and other technical issues, such as inadequate signaling information or signaling

information that is stripped away in transit.  To be properly billed as reciprocal or access, traffic

13

needs to be classified either as intrastate or interstate, and then as either intraMTA or interMTA. To assist the reader, I will go through each classification scenario.

Scenario 1: Intrastate IntraMTA
An intrastate intraMTA call is subject to reciprocal compensation. A call originating in Aberdeen, South Dakota, and terminating in Sioux Falls, South Dakota, is an intrastate call. Both towns are in the eastern half of South Dakota and in MTA-12 (Minneapolis), making it an intraMTA call. An intrastate intraMTA call is a local call and is subject to reciprocal compensation.

Scenario 2: Interstate IntraMTA
An interstate intraMTA call is subject to reciprocal compensation. A call originating in Aberdeen, South Dakota, and terminating in Minneapolis, Minnesota, is an interstate call. Aberdeen and Minneapolis are both located in MTA-12 (Minneapolis), making it an intraMTA call. An interstate intraMTA call is a local call and is subject to reciprocal compensation.

Scenario 3: Intrastate InterMTA
An intrastate interMTA call is subject to access compensation. A call originating in Aberdeen, South Dakota, and terminating in Rapid City, South Dakota, is an intrastate call. Rapid City is located in western South Dakota in MTA-22 (Denver) and Aberdeen is located in eastern South Dakota in MTA-12 (Minneapolis), making it an interMTA call. An intrastate interMTA call is a non-local call and is subject to access compensation.

Scenario 4: Interstate InterMTA
An interstate interMTA call is subject to access compensation. A call originating in Aberdeen, South Dakota, and terminating in Denver, Colorado, is an interstate call. Aberdeen is located in MTA-12 (Minneapolis) and Denver is located in MTA-22 (Denver), making it an interMTA call. An interstate interMTA call is non-local and is subject to access compensation.

[¶34]   To summarize, intraMTA calls are local calls, whether intrastate or interstate, and are subject to reciprocal compensation. InterMTA calls are non-local calls, whether intrastate or interstate, and are subject to access charges.

[¶35]   Verizon's position is that the federal government has established a regulatory framework for intercarrier compensation and that South Dakota is not permitted to regulate interstate traffic or to burden interstate traffic by excessive regulation on intrastate traffic. If the Court accepts Verizon's viewpoint, then originating carriers are not required to identify their traffic, and the traffic is considered local, which is billed at the lower recripocal rate. Alternatively, the

14

defendants and the intervenors contend that the South Dakota Statutes do not alter the established shared regulatory framework between the federal and State governments or the States' authority to regulate commercial mobile services. The defendants and intervenors also maintain that the federal government has occupied the field or regulated in this area. If the Court accepts the defendants' and the intervenors' viewpoint, the State can require originating carriers to identify all their traffic with accurate and verifiable information. If they do not meet this requirement, it is possible that the terminating LEC may bill the traffic as non-local, which is billed at the higher access rate.

9. THE PLAINTIFFS' PREEMPTION CLAIMS

[¶36]   Plaintiffs' complaint and motion is premised on several contentions. First, SDCL 49-31-110 is preempted by 47 C.F.R. § 20.11 and the FCC's T-Mobile Order because it allows a South Dakota LEC to bill a CMRS provider under its tariffs for calls that originate and terminate in the same MTA rather than through an interconnection agreement or request for agreement under 47 C.F.R. § 20.11(e). Second, SDCL 49-31-110 is preempted by 47 C.F.R. § 51.701 and the FCC's Local Competition Order because it authorizes LECs to charge access rates for CMRS calls that originate and terminate in the same MTA. Third, SDCL 49-31-110 and 111 are preempted because they require a CMRS provider to identify, measure, and report calls that are interMTA. SDCL 49-31-110 and 111 also require a CRMS provider to identify, measure, and report calls that are intraMTA. Plaintiffs claim that the intraMTA South Dakota statutory requirements are preempted. The Court will address each of these arguments in turn.

[¶37]   First, Verizon contends SDCL 49-31-110 is preempted by 47 C.F.R. § 20.11 and the FCC's T-Mobile Order because it allows a South Dakota LEC to bill a CMRS provider under its tariffs (access charges) for calls that originate and terminate in the same MTA rather than through an interconnection agreement or request for agreement under 47 C.F.R. § 20.11(e). SDCL 49-31-110 provides:

> *If necessary* for the assessment of transport and termination charges pursuant to 47 U.S.C. § 251(b)(5) as of January 1, 2004, an originating carrier of local telecommunications traffic shall, in delivering its traffic, transmit signaling information **in accordance with commonly accepted industry standards** giving the terminating carrier information that is sufficient to identify, measure, and appropriately charge the originating carrier for services provided in terminating

the local telecommunications traffic.  If the originating carrier is delivering both local and nonlocal (sic) telecommunications traffic, the originating carrier shall separately provide the terminating carrier with **accurate and verifiable information**, including percentage measurements that enables the terminating carrier to appropriately classify telecommunications traffic as being either local or nonlocal (sic), and interstate or intrastate, and to assess the appropriate applicable transport and termination or access charges.  If **accurate and verifiable information** allowing appropriate classification of the terminated traffic is not provided by the originating carrier, the terminating carrier may classify all unidentified traffic terminated for the originating carrier as nonlocal (sic) telecommunications traffic for service billing purposes (emphasis added).

[¶38]   The FCC's T-Mobile Order made modifications to the language of 47 C.F.R. § 20.11 and prohibited LECs from billing for call termination absent a request for an interconnection agreement.  *See* T-Mobile Order, ¶ 14.  47 C.F.R. § 20.11 in relevant part now reads:

". . . (d) Local exchange carriers may not impose compensation obligations for traffic not subject to access charges upon commercial mobile radio service providers pursuant to tariffs.  (e) An incumbent local exchange carrier may request interconnection from a commercial mobile radio service provider and invoke the negotiation and arbitration procedures contained in section 252 of the Act.  A commercial mobile radio service provider receiving a request for interconnection must negotiate in good faith and must, if requested, submit to arbitration by the state commission . . ."

[¶39]   South Dakota LECs terminate traffic originated by Verizon customers, which is subject to either reciprocal (local, i.e. intraMTA) or access (non-local, i.e. interMTA) compensation under current intercarrier compensation rules.  Current industry signaling standards, Verizon SS7 signaling information, and Verizon traffic reports do not transmit the necessary information to comply with SDCL 49-31-110, according to Verizon.  The FCC has determined that "it is not necessary for incumbent LECs and CMRS providers to be able to ascertain geographic locations when determining the rating for any particular call at the moment the call is connected."  Local Competition Order, ¶ 1044.  The FCC recognized that the technology permitting such location identification could not be readily implemented and could be burdensome.  Thus, the FCC authorized CMRS providers to calculate their compensation obligations on a negotiated basis or by extrapolating from traffic studies and samples.  Id.  Accordingly, Verizon maintains it has no obligation to transmit the location information required by SDCL 49-31-110.  Additionally,

16

CMRS noncompliance with SDCL 49-31-110 permits South Dakota LECs to reclassify all of Verizon's traffic to non-local traffic, thereby subjecting it to the higher access charges. This, says Verizon, directly conflicts with Rule § 20.11(d) because the state is authorizing LECs to impose obligations on traffic, which should not be subject to access charges. Finally, Verizon maintains SDCL 49-31-110 authorizes a South Dakota LEC to bill for call termination, even if the parties have not entered into an interconnection agreement. This, says Verizon, is contrary to the FCC's T-Mobile Order. Thus, says Verizon, SDCL 49-31-110 directly conflicts with federal law, and state laws conflicting with federal law are preempted by the Supremacy Clause.

[¶40]   47 C.F.R. § 20.11 and the FCC's T-Mobile Order may well preempt SDCL 46-31-110. While the 1996 Act established a different regulatory structure related to the exchange of local telecommunications traffic, it did not remove or change the access and interconnection requirements established in both federal and state law. *See* 47 U.S.C. § 251(g). Under the 1996 Act, South Dakota retained its authority over intrastate traffic and its authority to regulate the other terms and conditions with respect to commercial mobile services, with the exception of market entry and the rates charged by CRMS providers. State and local governments have the authority to impose requirements that are nondiscriminatory and competitively neutral to preserve universal service, protect public safety and welfare, ensure quality service, and safeguard consumer rights. *See* 47 U.S.C. § 253(b). SDCL 46-31-110 and 111 address the growth of the unidentified traffic problem (and the terminating LECs' ability to bill for that traffic), which may not have been fully addressed by the FCC's intercarrier compensation rules. The FCC rules do not address the information that must be transmitted with traffic, which would enable proper identification and which would ensure all traffic is subject to compensation at appropriate rates. But, we also know that the FCC has recognized that no technology existed (which could be readily implemented without burdens) to permit the identification of locations from which a call originates from a customer of a CRMS provider. Whether that is still true today is a material issue of fact. In addition, what the extent of the "burdens" might be is a material issue of fact. With the passage of SDCL 46-31-110 and 111, the State recognized and alleviated a problem, which may have been having a disproportionate impact on market competitiveness and on universal access. If local and rural LECS are not able to recover their

17

costs and make a profit, they may not be able to compete. In short, SDCL 46-31-110 and 111 may have been necessary to fix an emerging problem and fill a gap in the intercarrier compensation rules. That remains to be seen.

[¶41]   Section 20.11 also did not change the underlying substantive law related to interconnection; it only made procedural changes. Iowa Network Services, Inc. v. Qwest Corporation, 385 F.Supp.2d 850, 902 (S.D. Iowa. 2005); Rural Iowa Independent Telephone Association, 385 F.Supp.2d at 818 fn. 47. The intercarrier compensation rules remain unaffected by § 20.11. Under the 1996 Act and under the current intercarrier compensation rules, it is possible that states can regulate CMRS providers to require traffic identification. The South Dakota statutory provisions would be preempted by federal law if they unduly burden competition in contravention of the 1996 Act.

[¶42]   The language and the effect of SDCL 49-31-110 do not modify the duty of carriers to negotiate an interconnection agreement or the process by which the agreement is negotiated. Carriers are still required to negotiate, in good faith, interconnection agreements and reciprocal rates applicable to local traffic. Absent an interconnection agreement or a request for an agreement, LECs cannot bill for call termination. Assuming an interconnection agreement or a request for an interconnection agreement is in place, SDCL 49-31-110 requires an originating carrier to provide the terminating carrier with accurate and verifiable information so that the terminating carrier may appropriately classify traffic as being either local (intraMTA) or non-local (interMTA). Local traffic would then be billed at the negotiated reciprocal rate set by the interconnection agreement. Non-local traffic would be billed at the appropriate access rate.

[¶43]   Second, Verizon maintains that SDCL 49-31-110 is preempted by 47 C.F.R. § 51.701 and the FCC's Local Competition Order because it authorizes LECs to charge access rates for CMRS calls that originate and terminate in the same MTA. 47 C.F.R. § 51.701(b)(2) says, in effect, that calls between a LEC and a CMRS provider that originate and terminate in the same MTA are subject to reciprocal compensation. In its Local Competition Order, the FCC determined that the calls originating and terminating within the same MTA are subject to reciprocal compensation under § 251(b)(5) instead of access rates. Local Competition Order, 11 F.C.C.R. 15499 ¶ 1036. SDCL 46-31-110 does not necessarily disturb the MTA Rule. The statute requires an originating

18

carrier to provide accurate and verifiable information to a terminating LEC in order that the terminating LEC can properly classify the traffic as either reciprocal or access and bill accordingly.  Accordingly, 47 C.F.R. § 51.701 and the FCC's Local Competition Order do not necessarily preempt SDCL 49-31-110.

[¶44]  It is only when an originating carrier cannot identify the traffic as reciprocal or access that the statute purportedly permits the LEC to bill it as access traffic.  The classification of unidentified traffic as access provides incentive for the originating carrier to transmit accurate and verifiable information.  If the statute did not provide some type of sanction for failing to identify traffic, then carriers would have no incentive to identify their traffic.  The South Dakota approach of billing unidentified traffic at access rates may be a reasonable way to address traffic separation deficiencies.  In the Cavalier Telephone case, the FCC's Wireline Competition Bureau ("WCB") adopted an approach to unidentified traffic, which is similar to the one that South Dakota ultimately adopted.  *See* In the Matter of Petition of Cavalier Telephone LLC pursuant to Section 251(e)(5) of the Communications Act for Preemption of the Jurisdication of the Virginia State Corportion Commission Regarding Interconnection Disputes with Verizon Virginia, Inc. For Arbitration, DA 03-3947, released and adopted December 12, 2003, *recon. pending* ("Cavalier Telephone").  The WCB required Verizon to provide certain identification information, and, if this information was not provided to the terminating carrier then the terminating carrier could charge Verizon the higher of the intrastate or interstate switched access rate. Id.  Thus, the South Dakota approach of billing unidentified traffic at access rates may be a reasonable way to address traffic separation deficiencies, in the absence of FCC regulation and the unified intercarrier compensation regime.

[¶45]  The reciprocal negotiation process between LECs and CMRS providers could and should have been used as the forum to negotiate traffic identification responsibilities.  It may be more efficient to mandate traffic identification requirements by statute then to leave it up to individual carrier negotiations.  The South Dakota approach may have lowered negotiation transactions costs by mandating the requirements for unidentified traffic.  On the other hand, the defendants or intervenors or both may have used the South Dakota Legislature to interfere with the federal obligations to negotiate and, upon failure to negotiate, the obligation to arbitrate.

[¶46]   Third, Verizon claims SDCL 49-31-110 and 111 are preempted because they require a CMRS provider to identify, measure, or report calls that are interMTA.  SDCL 49-31-111 provides:

> An originating carrier of nonlocal (sic) telecommunications traffic shall, in delivering its traffic, transmit signaling information in accordance with commonly accepted industry standards giving the terminating carrier information that is sufficient to identify, measure, and appropriately charge the originating carrier for services provided in terminating the nonlocal (sic) telecommunications traffic.  If the originating carrier is delivering both intrastate and interstate nonlocal (sic) telecommunications traffic, the originating carrier shall separately provide the terminating carrier with accurate information including verifiable percentage measurements that enables the terminating carrier to appropriately classify nonlocal (sic) telecommunications traffic as being either interstate or intrastate, and to assess the appropriate applicable access charges.  If accurate and verifiable information allowing appropriate classification of the telecommunications traffic is not provided by the originating carrier, the terminating carrier may classify all unidentified nonlocal (sic) telecommunications traffic terminated for the originating carrier as intrastate telecommunications traffic for service billing purposes.

[¶47]   The FCC's Local Competition Order released CMRS providers from any obligations to identify or estimate interMTA traffic, according to Verizon.  They contend that the CMRS carrier and the terminating LEC may calculate overall compensation by extrapolating from traffic studies and samples. Verizon relies on the following authority for this proposition:

> CMRS customers may travel from location to location during the course of a single call, which could make it difficult to determine the applicable transport and termination rate or access charge.  We recognize that, using current technology, it may be difficult for CMRS providers to determine, in real time, which cell site a mobile customer is connected to, let alone the customer's specific geographic location.  This could complicate the computation of traffic flows and the applicability of transport and termination rates, given that in certain cases, the geographic locations of the calling party and the called party determine whether a particular call should be compensated under transport and termination rates established by one state or another, or under interstate or intrastate access charges. We conclude, however, that it is not necessary for incumbent LECs and CMRS providers to be able to ascertain geographic locations when determining the rating for any particular call at the moment the call is connected.  We conclude that parties may calculate overall compensation amounts by extrapolating from traffic studies and samples.

20

Local Competition Order, 11 F.C.C.R. 15499 ¶ 1044.  Verizon, however, omitted the paragraph's
last two lines.  These sentences provide:

> [f]or administrative convenience, the location of the initial cell site when a call
> begins shall be used as the determinant of the geographic location of the mobile
> customer. As an alternative, LECs and CMRS providers can use the point of
> interconnection between the two carriers at the beginning of the call to determine
> the location of the mobile caller or called party.

Local Competition Order, 11 F.C.C.R. 15499 ¶ 1044.  Although determining geographic location
in real time may complicate the process of identifying traffic, it does not necessarily release
CMRS providers from an obligation to identify or estimate interMTA traffic.  SDCL 49-31-110
and 111 mandate that originating carriers must transmit signaling information in accordance with
commonly accepted industry standards and provide accurate and verifiable information,
including verifiable percentage measurements to enable the terminating carrier to appropriately
classify non-local telecommunications traffic and to assess the appropriate applicable access
charges.

[¶48]   Whether there are "commonly accepted industry standards" permitting identification of
all calls is a material issue of fact.  Whether any claimed "standards" interfere with federal rights
of Verizon remains to be seen.  SDCL 49-31-110 may not even apply unless its requirements are
"necessary."  The statute requires Verizon to identify not only local vis-a-vis non-local traffic but
also interstate vis-a-vis intrastate traffic.  How could it be "necessary" to identify calls as
interstate or intrastate?  Such facts are immaterial, the question being from which MTA did the
call originate.  Is it also a discriminatory burden to require such identifications?  The statute also
requires "accurate and verifiable" information.  What does that require?  Who is to determine the
questions of accuracy and verification?  What standards apply?  What additional burdens are
imposed by this quoted language of SDCL 49-31-110?

[¶49]   What have the carriers done to negotiate before and after the passage of the state
legislation?  What has been done to arbitrate?  What has SDPUC done?

21

## CONCLUSION

[¶50]   SDCL 49-31-109 through 49-31-115 may be preempted as a result of the burdens they place on Verizon or as interfering with Federal requirements.  What the extent of the "burdens" might be is a material issue of fact.  What the extent of the interference might be is a material issue of fact.  Genuine issues of material fact preclude summary judgment.  Accordingly, the plaintiffs' request for summary judgment should be denied.

## ORDER

[¶51]   Now, therefore,

[¶52]   IT IS ORDERED that plaintiffs' motion (Doc. 51) for summary judgment is denied

Dated this _13th_ day of October, 2006.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY _____ DEPUTY

(SEAL)

22