

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| VERIZON WIRELESS (VAW) LLC,<br>COMMNET CELLULAR LICENSE<br>HOLDING LLC,<br>MISSOURI VALLEY CELLULAR, INC.,<br>SANBORN  CELLULAR, INC., and<br>EASTERN SOUTH DAKOTA<br>CELLULAR, INC.,<br>d/b/a VERIZON WIRELESS, | \* | |
| | \* | CIV 04-3014 |
| Plaintiffs, | \* | **2007 D.S.D. 30** |
| -vs- | \* | OPINION AND ORDER |
| STEVE KOLBECK, GARY HANSON and<br>DUSTIN JOHNSON, in their official capacities<br>as the Commissioners  of the South Dakota<br>Public Utilities Commission, | \* | |
| Defendants, | \* | |
| SOUTH  DAKOTA TELECOM-<br>MUNICATIONS ASS'N and<br>VENTURE COMMUNICATIONS<br>COOPERATIVE, | \* | |
| Intervenors. | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**KORNMANN, U.S. DISTRICT JUDGE**

## INTRODUCTION

[¶1]     Plaintiffs ("Verizon Wireless") instituted this declaratory judgment action, seeking a declaration that portions of Senate Bill 144, enacted by the 79th Session of the South Dakota Legislature, published as Chapter 284 of the 2004 Session Laws and now codified at SDCL 49-31-109 through 49-31-115, are unconstitutional, as applied to wireless carriers.  Governor Rounds signed the measure on February 27, 2004, and the statutes became effective July 1, 2004.

The specific claims are that SDCL 49-31-110 and 111 are preempted by the Telecommunications Act of 1996 and the regulations adopted by the Federal Communications Commission ("FCC"). Plaintiffs also seek a preliminary injunction enjoining enforcement of the statutes pending a decision as to the constitutionality of these statutes.

[¶2]    South Dakota Telecommunications Association ("SDTA") and Venture Communications Cooperative ("Venture") became parties to this suit after an unopposed motion to intervene. Plaintiffs then filed a motion for summary judgment. This motion was denied by the court due to the existence of several issues of material fact. Namely, the court held that: (1) issues of fact existed as to the relative burdensomeness of the statutes' identification requirements; (2) issues of fact existed as to whether the statutes conflicted with federal regulations; and (3) issues of fact also existed as to the requirement for identification of non-local wireless calls.

[¶3]    This matter was tried to the Court on August 15-16, 2007. At trial plaintiffs called three witnesses: John Clampit, Ed Harrop, and Abelkader Benaouda. Randy Olson, Assistant General Manager of Venture was called as a joint witness by the defendants and intervenors. The intervenors also presented testimony of Larry Thompson, CEO of Vantage Point Systems ("VPS"), an engineering and consulting firm. The Court received various exhibits into evidence. The Court was required to almost constantly remind the attorneys and the witnesses to speak English rather than use industry parlance with which the Court was not familiar.

[¶4]    On October 2, 2007, the parties jointly agreed and moved (Doc. 123) the Court pursuant to Fed.R.Civ.P. 21 for an order removing the State of South Dakota as a party defendant in this matter. Also post-trial, the parties have prepared post-hearing briefs and proposed findings of facts and conclusions of law. After considering the stipulations, testimony, documentary evidence, and post-hearing filings, I enter the following Findings and Conclusions.

### FINDINGS OF FACT

[¶5]    Senate Bill 144 became effective July 1, 2004, becoming Chapter 298 of the Session Laws of 2004. This chapter was codified as SDCL 49-31-109 through 49-31-115.

[¶6]    SDCL 49-31-109 through 49-31-115 provide:

> **49-31-109. Definitions.** Terms used in §§ 49-31-109 to 49-31-115, inclusive, mean:

2

(1) "Interexchange carrier," a telecommunications carrier providing nonlocal (sic) telecommunications services;

(2) "Local telecommunications traffic," any wireline to wireline telecommunications traffic that originates and terminates in the same wireline local calling area or wireline to wireless telecommunications traffic that originates within and is delivered to an actual point of presence established by a wireless service provider in the same wireline local calling area. Local telecommunications traffic also includes any wireless to wireline telecommunications traffic that originates and terminates in the same major trading area as defined in 47 CFR § 24.202(a) as of January 1, 2004;

(3) "Nonlocal (sic) telecommunications traffic," any wireline to wireline telecommunications traffic that originates in one wireline local calling area and terminates in another wireline local calling area and wireline to wireless telecommunications traffic that originates in one wireline local calling area and is delivered to an actual point of presence established by a wireless service provider in another wireline local calling area. Nonlocal (sic) telecommunications traffic also includes any wireless to wireline telecommunications traffic that originates in one major trading area and terminates in another major trading area;

(4) "Originating carrier," a telecommunications carrier whose network or service is used by a customer to originate telecommunications traffic. An originating carrier may be a wireline or wireless carrier transmitting local telecommunications traffic or an interexchange carrier transmitting nonlocal (sic) telecommunications traffic;

(5) "Terminating carrier," a telecommunications carrier upon whose network telecommunications traffic terminates to the called party;

(6) "Transiting carrier," a telecommunications carrier that does not originate or terminate telecommunications traffic, but either switches or transports traffic, or both, between an originating carrier and a terminating carrier;

(7) "Transit traffic," telecommunications traffic that an originating carrier has delivered to a transiting carrier or carriers for delivery to a terminating carrier.

**49-31-110. Local telecommunications traffic signaling information required to be provided by originating carrier to terminating carrier to assess charges.** If necessary for the assessment of transport and termination charges pursuant to 47 U.S.C. § 251(b)(5) as of January 1, 2004, an originating carrier of local telecommunications traffic shall, in delivering its traffic, transmit signaling information in accordance with commonly accepted industry standards giving the terminating carrier information that is sufficient to identify, measure, and appropriately charge the originating carrier for services provided in terminating

3

the local telecommunications traffic.  If the originating carrier is delivering both local and nonlocal (sic) telecommunications traffic, the originating carrier shall separately provide the terminating carrier with accurate and verifiable information, including percentage measurements that enables the terminating carrier to appropriately classify telecommunications traffic as being either local or nonlocal (sic), and interstate or intrastate, and to assess the appropriate applicable transport and termination or access charges.  If accurate and verifiable information allowing appropriate classification of the terminated traffic is not provided by the originating carrier, the terminating carrier may classify all unidentified traffic terminated for the originating carrier as nonlocal (sic) telecommunications traffic for service billing purposes.

**49-31-111.  Nonlocal** (sic) **telecommunications traffic signaling information required to be provided by originating carrier to terminating carrier to assess charges.**  An originating carrier of nonlocal (sic) telecommunications traffic shall, in delivering its traffic, transmit signaling information in accordance with commonly accepted industry standards giving the terminating carrier information that is sufficient to identify, measure, and appropriately charge the originating carrier for services provided in terminating the nonlocal (sic) telecommunications traffic.  If the originating carrier is delivering both intrastate and interstate nonlocal (sic) telecommunications traffic, the originating carrier shall separately provide the terminating carrier with accurate information including verifiable percentage measurements that enables the terminating carrier to appropriately classify nonlocal (sic) telecommunications traffic as being either interstate or intrastate, and to assess the appropriate applicable access charges.  If accurate and verifiable information allowing appropriate classification of the telecommunications traffic is not provided by the originating carrier, the terminating carrier may classify all unidentified nonlocal (sic) telecommunications traffic terminated for the originating carrier as intrastate telecommunications traffic for service billing purposes.

**49-31-112.  Transiting carrier required to deliver signaling information with telecommunications traffic--Liability for failure to deliver.**  A transiting carrier shall deliver telecommunications traffic to the terminating carrier by means of facilities and signaling protocols that enable the terminating carrier to receive from the originating carrier all signaling information, as required by §§ 49-31-110 and 49-31-111, the originating carrier transmits with its telecommunications traffic.  If any transiting carrier fails to deliver telecommunications traffic to another transiting carrier or to the terminating carrier with all of the signaling information transmitted by the originating carrier as required by §§ 49-31-110 and 49-31-111, and this results in telecommunications traffic that is not identifiable and therefore not billable by the terminating carrier to the appropriate originating carrier, the transiting carrier is liable to the terminating carrier for the transport

4

and termination or access compensation relating to the traffic that cannot be identified and billed to the appropriate originating carrier.

**49-31-113. Transit traffic or billing records to be provided by transiting carrier.** Upon the request of a terminating carrier, the transiting carrier shall provide detailed transit traffic records or billing records related to the telecommunications traffic delivered to the terminating carrier.

**49-31-114. Complaint procedure--Provisional remedies.** Any telecommunications carrier damaged by noncompliance with the provisions of §§ 49-31-109 to 49-31-115, inclusive, may file a complaint with the commission pursuant to the provisions of chapter 49-13. If a complaint is filed seeking enforcement of any of the provisions in §§ 49-31-109 to 49- 31-115, inclusive, the commission is authorized to order interim payments to the damaged party or other appropriate relief pending the final resolution of the complaint proceeding.

**49-31-115. Promulgation of rules.** The commission may promulgate rules pursuant to chapter 1-26 for the purpose of implementing the provisions of §§ 49-31-109 to 49-31-115, inclusive. The rules may address:
> (1) Defining the terms used in §§ 49-31-109 to 49-31-115, inclusive;
> (2) Signaling information requirements;
> (3) Carrier information necessary to appropriately classify telecommunications traffic;
> (4) The handling of complaints filed by carriers under §§ 49-31-109 to 49-31-115, inclusive; and
> (5) Transit traffic records.

[¶7]    Defendants Steve Kolbeck, Gary Hanson, and Dustin Johnson are Commissioners of the South Dakota Public Utilities Commission ("SDPUC") and are named as defendants in their official capacities. SDPUC is given legislative and statutory authority under Title 49 of the South Dakota Codified Laws and is responsible, among other things, for regulating intrastate telecommunications rates and service quality.

[¶8]    SDPUC has not adopted any rules as authorized by SDCL 49-31-115.

[¶9]    No person and no entity have sought to enforce the statutes in question, other than raising issues in this law suit.

[¶10]   Intervernor SDTA is a South Dakota corporation whose members consist of rural incumbent local exchange carriers ("ILECs") in South Dakota. An ILEC is a telephone company that was providing local service when the Telecommunications Act of 1996 was enacted. In

5

contrast, a competitive local exchange carrier ("CLEC") is any company that offers local telephone service and was not the original monopoly telephone company in a specific area.

[¶11]   SDTA is comprised of 29 community-based cooperative, privately owned, municipal and tribal telecommunications companies. Collectively, these companies serve approximately 80 percent of the state's land mass and roughly two-thirds of the state's incorporated communities. SDTA provides regulatory and legal assistance to its member companies as well as representation before the FCC, the SDPUC, and various other governmental agencies.

[¶12]   Intervenor Venture Communications Cooperative is an ILEC, a member company of SDTA, and a non-profit cooperative organization that provides telecommunications services in central and northeastern South Dakota.

[¶13]   Plaintiffs are business entities holding FCC spectrum licenses for certain geographic areas in South Dakota. These licenses enable them to provide wireless telecommunications service, referred to as Commercial Mobile Radio Service ("CMRS"), as defined in 47 U.S.C. § 332, throughout South Dakota under the "Verizon Wireless" brand name.

[¶14]   CMRS providers essentially offer one-way or two-way radio communication services between land stations and mobile receivers. *See* 47 C.F.R. § 20.3.

[¶15]   Verizon Wireless provides service in accordance with its licences by using network facilities that include cell sites, leased transmission facilities, and switches. A call made by a Verizon Wireless customer is picked up by a cell site, delivered on owned or leased transmission facilities to a switch, and then routed directly or indirectly to the carrier serving the person being called.

[¶16]   When routing the call to the carrier serving the person being called, Verizon Wireless may route the call through one or more Verizon Wireless switches before directly or indirectly delivering the call to the carrier serving the person being called.

[¶17]   Verizon Wireless operates approximately 90 cell sites that are physically located in South Dakota. Some South Dakota cell sites that are near a state border serve portions of other states. Verizon Wireless also operates cell sites in neighboring states, and some cell sites in other states serve portions of South Dakota.

[¶18]  Verizon Wireless operates a mobile switching center ("MSC") in Sioux Falls, South Dakota, that processes all calls originated and terminated through Verizon Wireless cell sites that are physically located in South Dakota.  The Verizon Wireless Sioux Falls MSC also processes calls originated or terminated through a number of cell sites located in northwest Iowa, one cell site in northeast Nebraska, and a number of cell sites located in Minnesota.

[¶19]  The Verizon Wireless Sioux Falls MSC is currently interconnected to Verizon Wireless switches located in Minneapolis and Golden Valley, Minnesota, and Fargo, North Dakota, through Intermachine Trunks ("IMTs").  IMTs are a connecting circuit between two automatic switching centers, both owned by the same company, used to transport calls.  IMTs lower costs for carriers because they enable the carrier to avoid using an interexchange carrier ("IXCs"), also referred to as a long distance carrier.  Due to their high cost, carriers generally utilize IMTs only for trunk routes where there is a significant amount of traffic.

[¶20]  Verizon Wireless is interconnected to the public switched telephone network ("PSTN"), the global collection of interconnects originally designed to support circuit-switched voice communication, through a physical connection it has with Qwest Communications.  These physical connections with Qwest allow Verizon Wireless to deliver calls to Qwest customers.  This situation is referred to as direct interconnection.  Phrased differently, carriers are said to be directly interconnected when they establish physical links between their networks for traffic exchange.

[¶21]  The physical connection with Qwest also enables Verizon Wireless to deliver calls destined to customers of other carriers who are also connected to Qwest.  This situation is referred to as indirect interconnection.  In the case of indirect interconnection, Qwest performs what is referred to as a "transit" function, and acts as an intermediary between the originating and terminating carrier.  Calls that are originated by Verizon Wireless and transited by Qwest are delivered to Qwest switches that are referred to as "tandems."  A tandem network is an arrangement of voice switches that enables calls to be routed through two or more switching centers in tandem fashion, such that each switch does not need to be directly connected to each other.

7

[¶22]   Verizon Wireless is connected to the Qwest tandems in Sioux Falls and Rapid City. Verizon Wireless also maintains direct connections with several ILECs in South Dakota other than Qwest. Where these direct connections are maintained, Verizon Wireless may deliver its calls without using Qwest as an intermediary. However, cell-phone companies usually do not choose to connect directly with rural exchange carriers, because the volume of business does not make it economically advantageous for the cell-phone company to do so.

[¶23]   Interconnection arrangements between or among carriers are governed by a complex system of federal intercarrier compensation regulations, which distinguish between and among different types of carriers and different types of services based on regulatory classifications. In the Matter of Developing a Unified Intercarrier Compensation Regime, CC Docket No. 01-92, Intercarrier Compensation Notice of Proposed Rulemaking, 16 F.C.C.R. 9610, 9613 (2001). These regulations treat different types of carriers and different types of services disparately, even though there may be no significant differences in the costs between or among carriers or services. To summarize, intercarrier compensation addresses the question of who should pay the costs of originating, transporting, and terminating calls or traffic that begin on one network and end on another network, often crossing or transiting a third network.

[¶24]   There are two general intercarrier compensation regimes: (1) access charges for long-distance traffic; and (2) reciprocal compensation. Federal and state access charge rules govern the payments that IXCs (long distance carriers) and CMRS providers make to LECs that originate and terminate long-distance calls. Federal or interstate access charge rules are set by the FCC. Intrastate access charges and intrastate calling generally are governed by state public utility commissions. CMRS carriers also pay access charges to LECs for CMRS to LEC traffic that is not considered local and hence not covered by the reciprocal compensation rules.

[¶25]   Reciprocal compensation rules govern the compensation between telecommunications carriers for the transport and termination of local traffic. Reciprocal compensation is payment from the carrier who originates a call to the carrier which receives or terminates a call. This is intended to permit the carrier for the customer who receives a call to recoup from the caller's carrier those expenses incurred for terminating the call or sending it to its final destination. So, reciprocal compensation refers to a situation where a CRMS customer calls a LEC customer who

8

is within the same local calling area, whereupon the first carrier pays the second carrier for completing, or 'terminating,' the call. Pacific Bell v. Pac West Telecomm, Inc., 325 F.3d 1114, 1119 (9th Cir. 2003).

[¶26]   For purposes of regulation, a call is treated as "local" if it originates and terminates in the same local calling area; a call is treated as "long distance" if it terminates in a local calling area different than the one in which it originates. *See* Competitive Telecomms. Ass'n v. FCC, 117 F.3d 1068, 1072 fn. 3 (8th Cir. 1997) (" CompTel ").

[¶27]   In defining the local service area for calls to or from a CMRS network, the FCC has determined that the Major Trading Areas ("MTAs") serve as the most appropriate definitions for local service area for CMRS traffic rather than local exchange areas. Local Competition Order, at 302, 11 F.C.C.R. ¶ 1036. Thus, traffic to and from a CMRS network that originates and terminates with the same MTA is "local" traffic and not "long distance" traffic subject to access charges.

[¶28]   Parts of South Dakota lie in three different MTAs. MTA-12 (Minneapolis) covers roughly the eastern and central two thirds of South Dakota but also includes all of North Dakota and almost all of Minnesota. MTA-22 (Denver) covers roughly the western one-third of South Dakota but also includes much of Colorado, most of Wyoming, western Nebraska, and even a small part of Kansas. MTA-32 (Des Moines) covers the southeast corner of South Dakota, most of Iowa, the northeast corner of Nebraska, western Illinois, and small portions of Wisconsin and Missouri.

[¶29]   There are SDTA Companies within all three of the above MTAs.

[¶30]   Verizon Wireless has cell sites that serve in all of these MTAs, and that serve across MTA and state boundaries.

[¶31]   Due to Verizon Wireless' network, its service areas, the MTA boundaries, and the LEC areas, Verizon Wireless may originate wireless traffic to South Dakota LECs - that is (a) intraMTA (inside the MTA and thus "local"), (b) intrastate interMTA (outside the MTA but inside the state), or (c) interstate interMTA (outside the MTA and outside the state).

[¶32]   The telecommunications industry uses or should use interconnection agreements as a mechanism to properly allocate the joint costs and benefits of interdependent communication

9

networks. Beyond establishing pricing arrangements, interconnection agreements also set or should set technical standards and service definitions. Absent a negotiated interconnection agreement or a request for an agreement, carriers cannot bill for call termination. This is what is referred to as a "bill-and-keep" arrangement. Thus, under a "bill and keep" system each carrier is required to recover the costs of termination and origination from its own end-user customer, instead of from its competitor.

[¶33]   The Telecommunications Act establishes procedures for negotiation, arbitration, and approval of interconnection agreements. If negotiations fail, compulsory arbitration is available.

[¶34]   Verizon Wireless has interconnection agreements with all (or nearly all) of the SDTA companies. SDTA members have negotiated per-minute reciprocal compensation rates ranging between $0.007 and $0.053 per minute with Verizon Wireless for intraMTA or "local" calls, i.e. within the MTA. For intrastate interMTA or outside the MTA but inside the state calls, SDTA members have negotiated access rates ranging between $0.072 and $0.125 per minute. For interstate interMTA or outside the MTA and outside the state calls, SDTA members have negotiated access rates ranging between $0.015 and $0.071 per minute.

[¶35]   When Verizon Wireless negotiates interconnection agreements, one area of negotiation concerns the terms of payment for interMTA (outside the MTA) traffic. In doing this, Verizon Wireless and its counterparts generally look at available network information for the purposes of negotiating a percentage of traffic that will be deemed to be interMTA and billed at access rates. If the parties cannot reach a negotiated resolution, it can be resolved through arbitration.

[¶36]   Before calls are delivered between carriers, their networks must communicate with each other to ensure that there are facilities available to complete the call. This is done through "signaling."

[¶37]   A commonly accepted industry standard protocol for delivering signaling information between telecommunications service providers is referred to as Signaling System 7 or "SS7." Presently, both Verizon Wireless and the SDTA companies utilize SS7 throughout their networks.

[¶38]   It is undisputed that Verizon Wireless complies with commonly-accepted industry standards with respect to its signaling practices in South Dakota.

10

[¶39]   Industry signaling standards develop over time through the operation of various industry bodies.  The process of developing industry consensus is necessary to ensure domestic switch compatibility.  So, if new industry standards were to be adopted regarding signaling, carriers would be expected to comply with these standards to insure compatibility.

[¶40]   SS7 provides carriers the present ability to exchange information necessary for call establishment, billing (to some extent), and routing.  Before a call can be established, the SS7 signaling networks communicate with each other to determine how and whether the call will be delivered.  As this is done, SS7 signaling messages are created by the originating carrier, and are carried on a separate circuit (i.e. an "out-of-band" circuit) from the voice circuit.

[¶41]   Once installed, the SS7 software fills in or "populates," in industry parlance, the SS7 message header and fields that are "mandatory" based on industry standards.  The mandatory SS7 fields that are automatically populated are message type, nature of connections, forward call indicators, calling party's category, user service information, and called party number.  If the message header and these mandatory fields are filled in, the SS7 message is deemed complete in accordance with industry standards, the call path is established, and the call is completed.

[¶42]   Under these current industry standards, information transmitted within SS7 message fields is not, in itself, sufficient to identify either the location of the calling wireless customer or the location of the connecting cell site or tower.  In other words, SS7 message fields will not tell a terminating carrier whether a call is intraMTA (local), intrastate interMTA (outside the MTA but inside the state), or interstate interMTA (outside the MTA and outside the state).

[¶43]   The SS7 signaling messages exchanged by Verizon Wireless identifies them as the carrier originating the call and identifies the particular Verizon Wireless switch through which the call was originated.  While this does provide some geographic information, it does not identify the MTA or state where a call originated because a call originated through a cell site connected, for example, to the Sioux Falls MSC could have come from one of several MTAs or states.

[¶44]   There are a number of SS7 fields that are considered to be "optional" in accordance with industry standards, meaning that they can be filled in or populated by the software with some degree of programming effort, but they are not necessary to establish a voice path and complete a call.  One such optional field is the Jurisdictional Information Parameter ("JIP") field.

11

[¶45]   According to industry standards, the JIP field can be filled in or populated when technically feasible with an NPA/NXX code.  A NPA/NXX code is a telecommunications industry acronym referring to the area code and the local exchange prefix for a block of ten thousand phone numbers (e.g. 605-225; 605 represents the area code for South Dakota and 225 represents one the prefixes assigned to a block of numbers in the Aberdeen area) that are assigned in the Local Exchange Routing Guide ("LERG") to the originating switch or MSC.  The LERG is a reference document issued by Telcordia Technologies used by carriers to determine how to route calls.  It also enables a carrier to identify what LEC or Operating Company that NPA/NXX belongs to, and to which tandem switch that NPA/NXX is connected.

[¶46]   Each time Verizon Wireless assigns a block of 10,000 phone numbers, it associates that NPA/NXX with its MSC in the LERG.  Verizon Wireless fills in or populates the JIP field with the first six-digits from the ten-digit Location Routing Number ("LRN") assigned to the Sioux Falls MSC.  As a result, all calls switched through the Sioux Falls MSC have the same JIP.

[¶47]   MSCs may cover large geographic areas and thus may have many NPA/NXXs associated with them.  These NPA/NXXs can be in different MTAs from the MSC used to facilitate the call.

[¶48]   Defendants and intervenors contend that information can be stored in optional fields to help determine whether a call is interMTA or intraMTA.  For instance, according to the defendants and the intervenors, Verizon Wireless could store the NPA/NXX code associated to the caller in the JIP field.  This would be done instead of the first six-digits from the ten-digit Location Routing Number ("LRN") assigned to the Sioux Falls MSC.

[¶49]   The fact remains that, even if it were possible to use signaling to communicate the "jurisdiction" of a wireless call, as the defendants and intervenors suggest, Verizon Wireless' network cannot identify the MTA in which a call is originated as the call is made.  This is because many wireless callers are mobile and the precise location of the caller cannot be determined.  Further, NPA/NXX codes do not correlate to MTAs.  In addition, a unilateral change to signaling fields would not be understood by other industry participants.

[¶50]   Verizon Wireless does not have the practical capability to communicate to terminating LECs "accurate and verifiable" information, including verifiable percentages, that would categorize the jurisdiction of the call.  There are a number of reasons for this.

12

[¶51]   First, no software solution presently exists that would categorize wireless calls for intercarrier compensation purposes based on the location of a cellular handset when a call is originated by a wireless customer.

[¶52]   Second, Verizon Wireless is not capable of measuring outbound calls, in an accurate and verifiable manner, for the purpose called for by the South Dakota statutes in question.

[¶53]   No such capability is required by the FCC or any other state.  Only South Dakota purports to require it.

[¶54]   Verizon Wireless could, by hiring a third-party vendor or by purchasing and integrating various software solutions, perhaps develop the capability to measure and report calls by using the originating cell site to estimate the MTA and state in which the cellular handset was located. The connecting cellular site could be used to approximate the MTA from which the call originated but there is no showing that this would meet the South Dakota statutory requirements. It would be very imprecise.  It also could be prohibitorily expensive.

[¶55]   When two carriers exchange traffic and it is not possible or practical for them to determine the jurisdictional nature of the traffic being exchanged on a call by call basis, they can perform a traffic study to establish the traffic mixes.  Traffic studies are used routinely within the industry for a variety of purposes.  Generally, the goal of these studies is to determine a factor that results in a reasonable estimate of the type of traffic being exchanged between the carriers. This factor is then used to determine appropriate compensation between carriers in lieu of "accurate and verifiable" information.

[¶56]   Traffic studies may be an effective device for estimating the amount of intraMTA and interMTA traffic for a particular snapshot in time.  Such studies though are not "accurate and verifiable" due to "sheer volumes of records" which would need to be evaluated.

[¶57]   All witnesses in this case agreed that one way to provide for the compensation for wireless calls that include intraMTA (local), intrastate interMTA (outside the MTA but inside the state), and interstate interMTA (outside the MTA and outside the state), is for parties to negotiate estimated billing percentages to be used for billing purposes.

[¶58]   Verizon Wireless has entered into interconnection agreements with some South Dakota LECs that require the use of traffic studies for the purpose of developing factors such as

13

"interMTA factors" and "percent interstate usage" ("PIU") factors.  However, the majority of the current interconnection agreements with South Dakota LECs do not incorporate an "interMTA" factor.

[¶59]  Based on the language of the Verizon Wireless interconnection agreements with SDTA members, if either party to the agreement so chooses, the agreement can be terminated or renegotiated to incorporate an "interMTA" factor.  No SDTA company has chosen to terminate or renegotiate its agreement with Verizon Wireless.

[¶60]  Rather than negotiate, it would appear that the defendants and intervenors convinced the South Dakota Legislature to attempt to impose terms that should be subject to negotiatation or arbitration.

[¶61]  The intervenors assert that SDCL 49-31-110 and SDCL 49-31-111 are intended to prevent LECs from losing revenue due to "phantom traffic" delivered to LEC networks.  Phantom traffic is used to describe unidentified telecommunications traffic where the carrier is unknown or the jurisdictional nature of the call is unknown.  If the carrier is unknown, the terminating carrier is unable to bill for the call.  If the jurisdictional nature of the call is unknown, the call may not be billed correctly.

[¶62]  Phantom traffic is a significant problem for carriers.  The FCC has sought comment from the industry on the best way to address phantom traffic.  One of the proposals, which is supported by SDTA and SDPUC, is the "Missoula Plan."  The Missoula Plan is a comprehensive intercarrier compensation reform effort, which seeks FCC approval of a uniform industry process for creating and exchanging call data records.  Rural and smaller carriers hope that the Missoula Plan will bring about a unification of interstate and intrastate access rates, thus removing the incentive for access rate arbitrage.

[¶63]  The principal problem for South Dakota LECs, in respect to phantom traffic, has been in establishing the jurisdictional nature of the call.  They are generally able to identify the carrier originating the call.

[¶64]  SDCL 49-31-110 and 111 would not enable LECs to identify the jurisdiction of traffic received from wireless carriers.  It is undisputed that the jurisdiction of a wireless call will be unknown as the call is delivered under commonly-accepted industry standards.  In addition, as

14

noted above, SS7 signaling messages do not identify the jurisdiction of a wireless call, and Verizon Wireless cannot provide accurate and verifiable information, identifying the jurisdiction of wireless calls.

[¶65]   Plaintiffs cannot reasonably or as a practical matter comply with the South Dakota statutes in question.

## CONCLUSIONS OF LAW

[¶66]   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and venue is proper in this Court.

[¶67]   "To succeed in a constitutional challenge to a legislative act, the challenger must prove beyond a reasonable doubt that the legislature acted outside of its constitutional authority." Wegleitner v. Sattler, 1998 SD 88, ¶ 4, 582 NW2d 688, 689 (1988) (*quoting* City of Chamberlain v. R.E. Lien, Inc., 521 NW2d 130, 131 (S.D. 1994)).

[¶68]   "The construction of a statute is a question of law." Delano v. Petteys, 94 SDO 700, 520 NW2d 606, 608 (1994) (*quoting* Petition of Famous Brands, Inc., 347 N.W.2d 882, 884 (S.D. 1984)).   "While, legislative acts are presumed to be constitutional, that presumption disappears when the unconstitutionality of the act is, 'clearly and unmistakenly shown and there is no reasonable doubt that it violates constitutional principles.'" S.D.E.A. v. Barnett, 1998 SD 84, ¶ 22, 582 NW2d 386, 392 *(quoting* Poppen v. Walker, 520 NW2d 238, 241 (S.D. 1994)).

[¶69]   Extrinsic evidence of legislative intent is not admissible.  The law in South Dakota is that although

> the true intent of the Legislature must be ascertained primarily from the language of the statute itself, without resort to extraneous devices . . . other considerations may be included * * * [such as the Act's] title, the history of its enactment, and the state of the law already in existence, . . . because the Legislature must have resorted to [these] same means to arrive at its purpose* * * *.  However, these "other considerations" have never included after-the-fact affidavits of individual legislators* * * *.  Views of individuals involved with the legislative process as to intent have not received the same recognition from [the South Dakota Supreme Court]. [The South Dakota Supreme Court has held] such individual testimony of no assistance * * * for two reasons: (1) it is the intent of the legislative body that is sought, not the intent of the individual members who may have diverse reasons for or against a proposition and (2) it is "universally

15

> held" that "evidence of a * * * draftsman of a statute is not a competent aid to a court in construing a statute."

S.D.E.A. v. Barnett, 1998 SD 84, ¶ 62, 582 NW2d at 400 (Zinter, Justice, concurring in part, dissenting in part) (citations omitted).

[¶70]   The rules of statutory construction in South Dakota follow general rules of such construction.

> The purpose of rules regarding the construction of statutes is to discover the true intention of the law, and said intention is to be ascertained by the court primarily from the language expressed in the statute.
>
> In applying legislative enactments, we must accept them as written. The legislative intent is determined from what the Legislature said, rather than from what we or others think it should have said. While it is fundamental that we must strive to ascertain the real intention of the lawmakers, it is equally fundamental that we must confine ourselves to the intention as expressed in the language used. To violate the rule against supplying omitted language would be to add voluntarily unlimited hazard to the already inexact and uncertain business of searching for legislative intent.
>
> One of the primary rules of statutory * * * construction is to give words and phrases their plain meaning and effect. This court assumes that statutes mean what they say and that legislators have said what they meant. When the language of a statute is clear, certain, and unambiguous, there is no occasion for construction, and the court's only function is to declare the meaning of the statute as clearly expressed in the statute.

South Dakota Subsequent Injury Fund v. Casualty Reciprocal Exchange, 1999 SD 2, ¶ 17, 589 NW2d 206, 209 (1999), (*quoting* Delano v. Petteys, 94 SDO 700, 520 NW2d at 608), (*quoting in turn* Petition of Famous Brands Inc., 347 NW2d at 884-85).

[¶71]   When construing a statute, technical terms of art should be interpreted by reference to the trade or industry to which they apply.  Louisiana Public Service Com'n v. FCC, 476 U.S. 355, 372 (1986).

[¶72]   Verizon Wireless claims that portions of Chapter 284 are preempted as applied to wireless carriers.  The Supremacy Clause of Art. VI of the United States Constitution invests Congress with the authority to preempt state law.  U.S. Const. Art. VI, Cl. 2; Louisiana Public Service Com'n v. FCC, 476 U.S. 355, 368 (1986).  Federal preemption occurs when:

16

(1) Congress explicitly prohibits state regulation; (2) Congress implicitly prohibits state regulation by pervasively occupying the regulatory field and leaving no room for the states to supplement federal law; (3) state law directly conflicts with federal law; or (4) a federal agency, acting within the scope of its delegated authority, intends its regulations to have preemptive effect. *Id.*

[¶73]   Preemption by the FCC of state regulation of telephone services is permissible when: (a) the matter to be regulated has both interstate and intrastate aspects; (b) preemption is necessary to protect a valid federal regulatory objective; and (c) state regulation would negate the exercise by the FCC of its own lawful authority because regulation of the interstate aspects of the matter cannot be "unbundled" from regulation of the intrastate aspects. Public Service Com'n of Maryland v. FCC, 909 F.2d 1510 (D.C. Cir. 1990); Qwest Corporation v. Scott, 380 F.3d 367, 372 (8th Cir. 2004).

[¶74]   The FCC is barred from preempting state regulation of a subject matter where there is a way to separate the interstate component from the intrastate component. Louisiana Public Service Com'n, 476 U.S. at 375 fn. 4, 106 S.Ct. at 1902 fn. 4; Qwest Corporation, 380 F.3d at 372.

[¶75]   Chapter 284 is not clearly written and much of the parties' disagreement relates to differing interpretations as to what the statute requires Verizon Wireless to do.

[¶76]   SDCL 49-31-110 requires, in part:

> [i]f necessary for the assessment of transport and termination charges pursuant to 47 U.S.C. § 251(b)(5) as of January 1, 2004, an originating carrier of local telecommunications traffic shall, in delivering its traffic, transmit signaling information in accordance with commonly accepted industry standards giving the terminating carrier information that is sufficient to identify, measure, and appropriately charge the originating carrier for services provided in terminating the local telecommunications traffic.

[¶77]   The phrase "transport and termination" under the FCC rules mean the same thing as "reciprocal compensation."

[¶78]   47 U.S.C. § 251(b)(5) imposes on all LECs a "duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications."

[¶79]   An "originating carrier" is defined in SDCL 49-31-109(4) as "a telecommunications carrier whose network or service is used by a customer to originate telecommunications traffic.

17

An originating carrier may be a wireline or wireless carrier transmitting local telecommunications traffic or an interexchange carrier transmitting nonlocal (sic) telecommunications traffic."

[¶80]   "Local telecommunications traffic" is defined in SDCL 49-31-109(2) as including ". . . any wireless to wireline telecommunications traffic that originates and terminates in the same major trading area as defined in 47 CFR § 24.202(a) as of January 1, 2004 . . . "

[¶81]The language of the first sentence of SDCL 49-31-110 is illogical.  Moreover, if the carriers do not have an interconnection agreement in place, then, under the first sentence, no is due.

[¶82]   More specifically it is illogical to require a wireless carrier generating local traffic to send signaling information to identify already identified local traffic as local traffic to the terminating carrier.  This is a burden without any benefits.

[¶83]   It would never be necessary for assessing transport and termination [namely reciprocal compensation] charges pursuant to interconnection agreements [if construed to mean this] to provide signaling information that is sufficient to identify, measure, and appropriately charge the originating carrier for services provided in terminating local traffic.  If the traffic is local (intraMTA), then termination charges are the negotiated rate for reciprocal compensation, as established in the interconnection agreement between the originating and terminating carrier.  By its own terms, the type of traffic and the appropriate charge are already known.

[¶84]   In the context of this lawsuit, "commonly accepted industry standards giving the terminating carrier information that is sufficient to identify, measure, and appropriately charge the originating carrier for services provided in terminating the local telecommunications traffic" do not exist but are required by the statutes.

[¶85]   The term "accurate and verifiable information" as used in the second and third sentences of SDCL 49-31-110 are not defined by statute or rule.  It is presently impossible for Verizon Wireless to meet the statutory requirements.  Even to attempt to do so would overly burden interstate communications, especially on a call by call basis.

[¶86]   The claim by defendants and intervenors that the requirements of "accurate and verifiable information" are the same as estimates based on a study or studies is rejected as not making sense

18

under the English language.  This is certainly the case since the third sentence of SDCL spells out a call by call obligation imposed on plaintiffs, an obligation that cannot be met.

[¶87]   The third sentence, "the penalty provision," provides:

> [i]f accurate and verifiable information allowing appropriate classification of the terminated traffic is not provided by the originating carrier, the terminating carrier may classify all unidentified traffic terminated for the originating carrier as nonlocal (sic) telecommunications traffic for service billing purposes.

[¶88]   This sentence authorizes the terminating carrier to charge an access rate for traffic that cannot be identified.

[¶89]   This penalty would create an access tariff on all wireless originated traffic.  This is despite the fact that the FCC has clearly banned access charges for calls originating and terminating within the same MTA, i.e. local calls.  South Dakota statutes attempt to trump federal law and this is not to be permitted.

[¶90]   This penalty provision applies regardless whether an interconnection agreement is in place or has been formally requested between the two carriers exchanging traffic.  Under the FCC amended rules, in the absence of a request for an interconnection agreement, no compensation is owed for termination.  In the Matter of Developing a Unified Intercarrier Compensation Regime, CC Docket 01-92, 20 F.C.C.R. 4855, 4863 ¶ 14, fn. 57, Declaratory Ruling and Report and Order (2005) ("T-Mobile Order").

[¶91]   A state law authorizing a LEC to bill for call termination in the absence of an interconnection agreement or a formal request for one would directly conflict with, and is preempted by, the FCC's T-Mobile Order.  The Legislature cannot create an obligation for payment when no obligation exists because the parties have not executed or requested an interconnection agreement.

[¶92]   SDCL 49-31-110 could also be read to apply only in instances where the parties have an interconnection agreement.  However, in order to achieve this result, one would have to interpret the "if clause" of the first sentence as confining the signaling information, the accurate and verifiable information, and the penalty provisions to circumstances where the parties have an interconnection agreement.  In other words, the compliance duties imposed by the first and second sentences are part of the same duty or related duties in the context of an interconnection

19

agreement or they fly in the face of the interconnection agreement and abrogate by statute already existing contracts. The Legislature may not do so as a matter of law.

[¶93]   Alternatively, SDCL 49-31-110 could be read to apply in all circumstances, even when the parties do not have an interconnection agreement or have not made a formal request for one. The language of the first sentence may not constrain or be connected to the second or third sentences because the sentence may be confined to describing a future requirement to provide signaling information. The sentence may be a nullity or unrelated. The second and third sentences do not mention an interconnection agreement. The second sentence may be the only mandatory duty created by this statutory section and nowhere is an interconnection agreement mentioned.

[¶94]   The parallel provisions of SDCL 49-31-111, which use nearly identical language make no mention of an interconnection agreement. Further, the manner by which the first sentence is constructed makes it less plausible that it was meant to constrain or apply to the others. The sentence is an independent conditional. The following sentences make no reference to the initial sentence or condition.

[¶95]   SDCL 49-31-111 applies to all instances and suffers from the same constitutional infirmities as SDCL 49-31-110.

[¶96]   These mandated compliance requirements fly in the face of the purposes of the Telecommunications Act ("the Act" or "the 1996 Act"). According to the provisions of the 1996 Act, the purpose of the Act is the promotion of competition and the reduction of regulation in the telecommunications industry, in order to secure lower prices and higher quality services for American telecommunications consumers and to encourage the rapid deployment of new telecommunications technology. Telecommunications Act of 1996, Pub. L. No. 104-104, purpose statement; 110 Stat. 56 (1996). The compliance burden imposed by the statutes would have the effect of increasing regulatory oversight and increasing consumer prices. Additional regulatory oversight may be necessary to resolve compliance disputes among carriers. Consumer prices may also be effected because carriers will likely pass along the additional costs associated with the business changes needed to even attempt to address these new South Dakota compliance requirements.

20

[¶97]  All telecommunications traffic as to South Dakota would be swept up by the statutory provisions, including "bill-and-keep," thereby invading federal regulatory power and conflicting with those mandates.  Finally, the particular statutory requirements of these statutes create an impermissible burden on both interstate and intrastate communications.

[¶98]  Accordingly, I reiterate, find , and conclude that plaintiffs cannot today meet the requirements of SDCL 49-31-110 and 111 because (1) there are no commonly-accepted industry standards for signaling that will allow a CRMS provider to communicate whether a call is intraMTA, intrastate interMTA, or interstate interMTA, and (2) plaintiffs cannot provide "accurate and verifiable" information as required by the statutes.  SDCL 49-31-110 and 111 serve only to authorize the imposition of penalties, not to facilitate the identification of CRMS traffic.  By imposing requirements that cannot be met, and authorizing penalties that conflict with the federal scheme for intercarrier compensation, the state has clearly undermined federal law.  As a result, SDCL 49-31-110 and 111 are preempted, as applied to CRMS providers.

[¶99]  I find and conclude that the State of South Dakota, including the SDPUC, does not possess the authority to resolve intercarrier compensation issues in accordance with the mechanisms in SDCL 49-31-110 and 49-31-111.  As a result, the enforcement of those provisions is preempted as conflicting with federal law, as applied to CRMS providers.

[¶100] Verizon Wireless seeks injunctive relief against the defendants, prohibiting them from enforcing the provisions of SDCL 49-31-110 and 111 through the complaint proceeding under SDCL 49-31-114 and 49-31-115.

[¶101] Because the substantive obligations and penalty provisions in SDCL 49-31-110 and 111 are preempted as to CRMS providers, it is appropriate for the defendants to be enjoined from enforcing those provisions through complaint proceedings or otherwise.

### ORDER

[¶102] Now, therefore, based on the foregoing,

[¶103] IT IS ORDERED:

> (1)  Plaintiffs are granted the declaratory and injunctive relief requested.

(2)  SDCL 49-31-110 and 49-31-111 are preempted and unenforceable as to CMRS providers, and the defendants are enjoined from enforcing the preempted provisions as to CMRS providers or CRMS traffic.

(3) The provisions of SDCL 49-31-113 through 49-31-115 must fall with the rest of Chapter 298 of the Session Laws of 2004.  The Legislature clearly would not have intended these to stand alone in the absence of the other provisions of Chapter 298 and the entire Chapter is therefore in violation of the United States Constitution.

(4) The parties joint motion (Doc. 123) to remove the State of South Dakota as a party is granted.

[¶104] Dated this 28th day of December, 2007.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____
                              DEPUTY
        (SEAL)

22